Civil Action Number 11-cv-01066-WJM-KLM

Shonya Pool,
    Plaintiff,

v.

Wells Fargo Bank, N.A.
    Defendant

## PLAINTIFF'S FIRST AMENDED COMPLAINT

### INTRODUCTION

1. The plaintiff brings this claim to rectify the Defendant's violations of Colorado Revised Statutes, 38-40-103-104, the Colorado Consumer Protection Act (CCPA), for fraud, and promissory estoppel.  Wells Fargo offered to modify the Plaintiff's mortgage loan if she could make three trial payments of $744 per month.  The Plaintiff complied by making her payments for several months only to have Wells Fargo pull the rug out from underneath her by initiating foreclosure proceedings against Plaintiff and refusing to accept any further payments from Plaintiff.

2. In October 2008, Wells Fargo Bank, N.A. accepted $25 billion in funds from the United States Government as part of the Troubled Asset Relief Program ("TARP"), 12 U.S.C. § 5211.  Six months later Wells Fargo Home Mortgage signed a contract with the U.S. Treasury agreeing to participate in HAMP -- a program in which Wells Fargo received incentive payments for providing affordable mortgage loan modifications and other alternatives to foreclosure to eligible borrowers.

3. Although Wells Fargo gladly accepted funds from the U.S. Government to participate in the HAMP program, Wells Fargo has not held up their end of the bargain.  Instead, Wells Fargo has been using the HAMP program to generate "defaults" on mortgage loans, and then to foreclose on the unsuspecting borrowers in the interest of increasing its bottom line.

### PARTIES

4. Shonya Pool is an individual consumer who currently resides at 5755 W. Florida Ave, Lakewood, CO 80232.

5. Wells Fargo Bank, N.A. is a mortgage lender with a principal place of business at 420 Montgomery Street, San Francisco, CA 94104.

## FACTUAL ALLEGATIONS

6. On December 16, 2005, Shonya Pool (hereinafter "Pool") and her ex-husband Darren Pool, executed a promissory note with Wells Fargo Bank, N.A. ("Wells Fargo") in the amount of $172,000 for the re-finance of her principal residence, 5755 W. Florida Ave, Lakewood, CO 80232.

7. The Note was secured by a Deed of Trust granting Wells Fargo a security interest in Pool's residence in the event that Pool defaulted on the terms of the Note.

8. Soon thereafter, Wells Fargo sold all of its right, interest, and title it had in Pool's Note and Deed of Trust to Freddie Mac; however, Wells Fargo retained the servicing rights to Pool's mortgage loan.

9. Pool's original Note was endorsed in blank by Joan Mills, a Wells Fargo employee, and delivered to the custody of Freddie Mac pursuant to Sections 16.4. and 16.8 of the Freddie Mac Servicing Guidelines.

10. Wells Fargo's duties in servicing the Plaintiff's loan for Freddie Mac's benefit are defined and described in the Freddie Mac Single-Family Seller/Servicer Guide.

11. Part of Wells Fargo's duties in servicing the Plaintiff's loan for Freddie Mac is to commence foreclosure proceedings upon Pool's default on the Note.

12. Freddie Mac directed Wells Fargo to use Wells Fargo's name as the real party in interest in the event that it needed to foreclose on Pool's residence, and if Wells Fargo needed to get the original note to prove standing, Freddie Mac agreed to release custody of the original note to Wells Fargo to accomplish a foreclosure proceeding.

13.  As a servicer of Pool's loan, Wells Fargo was also responsible for collecting payments from Pool, performing an accounting of Pool's loan balance, and sending Pool monthly statements.

14. Part of Wells Fargo's duties in servicing Pool's mortgage loan is to assess late fees in accordance with Freddie Mac Single-Family Seller/Servicer Guide § 64.3.

15. Part of Wells Fargo's duties in servicing Pool's mortgage loan is to assess property inspection fees in accordance with Freddie Mac Single-Family Seller/Servicer Guide § 64.7 and § 65.33 should Wells Fargo ever consider Pool to be delinquent on her mortgage loan.

16. In connection with any property inspections that Wells Fargo had performed on Pool's residence, Wells Fargo was required to keep documentation of said property inspections on a Form 1013, 1-4 "Unit Property Inspection Report." - Freddie Mac Single-Family Seller/Servicer Guide, § 64.7(d).

17.  Wells Fargo is required to keep all Property Inspection Reports in the mortgage file as required by Freddie Mac Single-Family Seller/Servicer Guide § 64.7(e).

18. Wells Fargo did in fact perform property inspection(s) on Pool's residence.

19. The property inspections that Wells Fargo performed on Pool's residence were documented on a "Form 1013, 1-4 Unit Property Inspection Report."

20. The Form 1013 that Wells Fargo used to document property inspections on Pool's residence were in fact kept in the ordinary books and records of Wells Fargo in accordance with Freddie Mac Single-Family Seller/Servicer Guide § 65.32.

21. Part of Wells Fargo's duties in servicing Pool's mortgage loan is to order broker price opinion valuations of the property in accordance with Freddie Mac Single-Family Seller/Servicer Guide § 65.25 and § 65.38.

22. Pool is informed and on that basis alleges that Wells Fargo did in fact order a broker price opinion valuation of Pool's residence through www.bpodirect.net.

23. Pool is informed and on that basis alleges that Wells Fargo was emailed a copy of the broker price opinion valuation of Pool's residence and thereafter retained the broker price opinion in Wells Fargo's ordinary books and records.

24. Pool remained current on her mortgage loan from 2005 until November 2009.

25. In 2009, Darren and Shonya Pool became divorced from each other. As a consequence thereof, Pool experienced a reduction in income.

26. Attempting to be responsible and knowing that she would have difficulties making her regular mortgage payments, Pool contacted Wells Fargo around November 2009 to inquire about the possibilities of a home loan modification under the HAMP program.

27. In November 2009, a Wells Fargo representative reviewed Pool's financial situation with her and informed Pool that she did indeed qualify for a "trial modification period" under the HAMP program.

28. During the November 2009 conversation between Pool and the Wells Fargo representative, Pool was verbally advised that so long as she made her 3 trial period payments and submitted all the required documentation, her loan would be modified.

29. In December 2009, Wells Fargo sent Pool a contract called "Home Affordable Modification Program Loan Trial Period."

30. As part of the "trial modification period", Pool was to make three (3) monthly payments of $744, and submit any required documentation to Wells Fargo. Pursuant to the contract, Pool was to make her first payment of $744 on or before 1/1/2010, her second payment of $744 on or before 2/1/2010, and her third payment on or before 3/1/2010.

31. On December 7, 2009, Pool signed the agreement and sent it back to Wells Fargo. At all times relevant hereto, Pool performed her end of the contract. Pool made her first payment of $744 on 12/17/09, her second payment of $744 on 1/20/10, and her third payment of $744 in February 2010.

32. On or around March 2010, when Pool had not heard back from Wells Fargo after she had made her 3 trial payments, Pool called Wells Fargo to inquire of the status of her loan.

33. During the March 2010 conversation, the Wells Fargo representative informed Pool that "everything was ok" and that her modification was still "under review." The Wells Fargo representative further instructed Pool to continue making her $744 per month payments, which Pool continued to do. Pool made a payment of $744 on March 12, 2010, another payment of $744 on April 12, 2010, another payment of $744 on May 18, 2010, another payment of $744 on June 14, 2010, and a final payment of $744 on July 13, 2010.

34. Around August 2010, Pool received a notice of foreclosure from Wells Fargo. Wells Fargo indicated to Pool that it considered the $744 monthly payments to be a "default" and that it had accelerated the balance of the entire loan.

### CREATION OF THE HOME AFFORDABLE MODIFICATION PROGRAM

35. Congress passed the Emergency Economic Stabilization Act of 2008 on October 3, 2008 and amended it with the American Recovery and Reinvestment Act of 2009 on February 17, 2009 (together, the "Act"). 12 U.S.C.A. §5201 et. seq. (2009).

36. On February 18, 2009, pursuant to their authority under the Act, the Treasury Secretary and the Director of the Federal Housing Finance Agency announced the Making Home Affordable Program.

37. HAMP is funded by the federal government, primarily with TARP funds. The Treasury Department has allocated at least $75 billion to HAMP, of which at least $50 billion is TARP money.

38. Under HAMP, the federal government incentivizes participating servicers to enter into agreements with struggling homeowners that will make adjustments to existing mortgage obligations in order to make the monthly payments more affordable. Servicers receive $1000.00 for each HAMP modification.

### WELLS FARGO'S ENROLLMENT IN THE HAMP PROGRAM

39. On April 13, 2009, Michael J. Heid of Wells Fargo Home Mortgage executed an

Servicer Participation Agreement, thereby making Wells Fargo a participating servicer in HAMP.

40. A HAMP Modification consists of two stages. First, a Participating Servicer is required to gather information and, if appropriate, offer the homeowner a Trial Period Plan ("TPP"). The TPP consists of a three-month period in which the homeowner makes mortgage payments based on a formula that uses the initial financial information provided.

41. Upon completion of the TPP, Wells Fargo is supposed to modify the borrower's mortgage loan.

## FIRST CLAIM FOR RELIEF
## FRAUD

42. Wells Fargo verbally advised the Plaintiff in November 2009 to begin making three trial payments of $744 per month with the promise that doing so would result in a permanent modification.

43. At all times relevant hereto, Wells Fargo had actual knowledge that it would not be offering the Plaintiff a permanent modification.

44. Wells Fargo made the false statement to induce the Plaintiff into making a monthly payment that is less than the regularly scheduled payment so that Wells Fargo could initiate foreclosure proceedings.

45. Wells Fargo stands to make more money foreclosing on Pool's property than it would if it had given Pool a permanent HAMP modification.

46. Pool actually relied on Wells Fargo's false statements by paying $744 per month during the trial modification period.

47. Pool reasonably relied on Wells Fargo's false statements because of the contents of the December 7, 2009 contract.

48. Wells Fargo's false statements have caused the Plaintiff actual damages. Specifically, the Plaintiff will not be able to cure any arrears on the mortgage because Wells Fargo has accelerated the entire balance of the Note. Wells Fargo has scheduled a foreclosure sale

date on the Plaintiff's home on June 6, 2011 which has caused the Plaintiff loss of sleep and emotional distress.  Furthermore, Wells Fargo has added improper late fees to the balance of Plaintiff's loan which will reduce her right to a surplus on the sale of her residence at the foreclosure auction.

49. Moreover, if Pool had known that Wells Fargo was not going to modify her mortgage loan, she would have continued to make her regularly scheduled payments in lieu of following Wells Fargo's advice and making payments of $744 per month.

50. Pool is informed and on that basis alleges that at all times relevant hereto, Pool was eligible to participate in the HAMP program and that Wells Fargo mislead her to participate in the HAMP program for the specific purpose of inducing a so-called "default" so that Wells Fargo could foreclose on Pool's residence instead of modifying Pool's mortgage loan.

## SECOND CLAIM FOR RELIEF
## COLORADO CONSUMER PROTECTION ACT (CCPA)

51.  Wells Fargo has committed the following unfair and deceptive practices in the ordinary course of its business in its dealings with Pool:

   a. Knowingly making a false representation of approval of services.  Wells Fargo violated this by making verbal false misrepresentations that Pool would be approved for a loan modification if she made trial payments in the amount of $744 and submitted all the required documentation.

   b. The November 2009 conversation between Pool and Wells Fargo was an advertisement of services (loan modifications).  At all times relevant hereto, Wells Fargo advertised home loan modifications to borrowers with the intent not to supply reasonably expectable public demand.  Wells Fargo accepted TARP money to perform HAMP loans without having the intent to actually supply loan modifications to a reasonable public demand.  Wells Fargo advised Pool that it would provide her with a home loan modification when it knew that it never intended to actually do so.

   c. Engaging in generally unfair and deceptive practices with Pool such as common law fraud and refusing to respond to written requests within 20 days as required by C.R.S. 38-40-103.

      d. Misrepresenting to Pool in November 2009 that she was eligible to participate in the HAMP program and then simultaneously taking the position that Pool was ineligible to participate in the HAMP program in Wells Fargo's denial of the loan modification on June 18, 2010.

52. Wells Fargo's unfair and deceptive practices have a significant public impact. In January 2010, the U.S. Treasury reported that Wells Fargo had 350,169 HAMP-eligible loans in its portfolio. Of these loans, just 8,424 resulted in permanent modifications (approximately 2%) even though many more homeowners had made the payments and submitted the documentation required by the TPP Agreement.

53. Wells Fargo's failure to live up to their end of the bargain is impacting numerous Colorado consumers who are losing their homes to foreclosures as a result of Well's Fargo's actions. Furthermore, Wells Fargo's actions are also negatively impacting the entire State of Colorado by decreasing property values and flooding Colorado's court system with unnecessary foreclosures.

54. Wells Fargo has caused injury to Pool in the form of a wrongful foreclosure proceedings, improper late fees and "other charges" added to her loan, loss of savings of $744 per month which could have been used for something more worthy, lost opportunities to pursue refinancing or other loss mitigation opportunities, significant emotional distress, and loss of sleep.

55. Pool is a consumer of Wells Fargo's loan modification services.

56. At all times relevant hereto, Wells Fargo acted in bad faith in its dealings with Pool.

57. Wells Fargo is liable to Pool for the greater of $500 or actual damages, plus reasonable attorney fees and suit money.

### THIRD CLAIM FOR RELIEF
### PROMISSORY ESTOPPEL

58. Wells Fargo represented to the Plaintiff that if she made her three trial period payments of $744 per month, she would receive a permanent home loan modification.

59. Wells Fargo's representations were intended to induce Pool into relying on them by commencing the trial period payments.

60. Pool actually relied on Wells Fargo's representations by making the trial period payments for numerous months.

61. At all times relevant hereto, Pool's reliance on Wells Fargo's representations was reasonable because Wells Fargo actually put their representations in writing in the December 7, 2009 contract.

62. Pool's reliance was to her detriment. She still has not received a permanent mortgage loan modification. Pool was on the receiving end of improper late fees and property inspection fees which were wrongfully added to the balance of her loan. Furthermore, the loan balance has been accelerated through no fault of her own making it impossible for her to cure the alleged default. Finally, Pool is facing a foreclosure sale on June 22, 2011 through no fault of her own.[1]

## FOURTH CLAIM FOR RELIEF
## COLORADO REVISED STATUTES 38-40-103 & 38-10-104

63. In November 2010, Pool sent a letter to Wells Fargo disputing certain fees which had been added to the balance of her loan and requesting certain information pertaining to the servicing of her loan which was readily available in the ordinary books and records of Wells Fargo.

64. More specifically, the debtor requested an explanation of the following items:

   a. A complete payment history of her loan.

   b. Pool disputed the fact that Wells Fargo had added a property inspection fee to the balance of her loan, requested reasons why it had been added, and also requested the name of the company that Wells Fargo paid to perform the inspection.

---

[1] Wells Fargo refused to accept further payments from Pool upon initiation of the foreclosure proceedings.

    c. Pool requested information from Wells Fargo as to why her payments of $744 were being kept in a "suspense account" instead of being applied to the balance of her loan in accordance with the Deed of Trust.

    d. A breakdown of all of the late fees which had been added to the balance of her loan.

    e. Information as to why Wells Fargo had paid someone to perform a Broker Price Opinion (BPO), and then added the fee to her loan. Pool also requested a copy of the BPO report.

    f. Information concerning attorney fees that had been added to the balance of her loan. Specifically, Pool requested the names of any law firms that Wells Fargo had retained to perform legal work concerning her loan, the amount of the retainer, and whether any of the retainer had been refunded.

    g. The identity of the owner of her mortgage loan.

    h. Information concerning her escrow account including the latest escrow statements and the identity of anyone who had received distributions from her escrow account.

    i. Information as to why her home loan modification was denied and whether Wells Fargo was still interested in modifying the loan.

65. On December 27, 2010, Wells Fargo responded to Pool's letter by and through its agent Angie Rhines. Ms. Rhines neglected much of the information in Pool's Nov 2010 letter, but her response informed Pool of the following:

    a. Pool was provided with a complete payment history.

    b. Rhines made a vague reference to some fees that were added to the balance of Pool's loan for "monitoring the loan while in active bankruptcy."

    c. Rhines informed Pool that property inspections are ordered for any loan that is delinquent.

    d. Rhines kindly waived $52.95 in late fees.

    e. Rhines informed Pool as to why she believed Wells Fargo's use of a suspense account was proper.

    f. Rhines informed Pool that Wells Fargo's motion for relief from stay in the bankruptcy court was granted, although Pool never inquired of this.

    g. Rhines informed Pool that her loan was in foreclosure status and that reinstatement figures could be obtained through Castle Stawiarski, LLC.

    h. Rhines referred Pool to the "Home Preservation Department" to inquire whether her loan qualified for other arrangements.

66. Pool did not believe that Rhine's December 2010 response really answered the majority of her questions. Instead, Rhine's response more or less danced around the questions without actually answering the majority of them.

67. In an effort to show good faith, and to comply with C.R.S. 38-40-104, Pool sent Wells Fargo a follow up letter in January 2011. Pool re-iterated her questions and requested that Rhines or another Wells Fargo representative respond to her questions.

68. On February 4, 2011, Rhines responded back to Pool and answered a few more of Pool's questions. However, Rhines still refused to answer the following questions:

    a. The name of the company that Wells Fargo paid to perform a property inspection of her residence.

    b. The name of the person or company that Wells Fargo paid to conduct a Broker Price Opinion on her residence.

    c. A copy of the Broker Price Opinion report.

    d. Information about any law firms that Wells Fargo had paid to perform work on Pool's account and the amount of the retainer, if any.

69. Rhines also made the following statement in her February 4, 2011 response "you requested a copy of the loan file and/or any records associated with the loan. The records and loan file are considered confidential business records and are the property of WFHM. We do not produce copies without a valid subpoena."

70. Pool never asked Wells Fargo for a copy of the loan file. However, Rhines response demonstrates Wells Fargo's general attitude of indifference to taking care of their customers and also demonstrates Wells Fargo's pattern and practice of evasiveness when dealing with its customers.

71.  Pool alleges that all of the information that she asked for in her November 2010 and January 2011 letters requested information concerning the servicing of her mortgage loan which was readily available to Wells Fargo in its ordinary books and records.

72.  Pool alleges that Wells Fargo violated C.R.S. 38-40-103 by not providing information about the servicing of her mortgage loan, which was readily available to Wells Fargo in its ordinary books and records.

73.  Although C.R.S. 38-40-103 does not define the term "servicing", the Freddie Mac Single-Family Seller/Servicer Guide between Freddie Mac and Wells Fargo describes and outlines Wells Fargo's servicing duties.

74. Information about property inspection fees that Wells Fargo ordered on Pool's residence is related to the "servicing" of Pool's loan because Freddie Mac Single-Family Seller/Servicer Guide § 64.7 and 65.33 specifically require Wells Fargo to order a property inspection fee under certain circumstances as part of Wells Fargo's servicing duties.

75. Information about property inspections that Wells Fargo ordered on Pool's residence is readily available in Wells Fargo's ordinary books and records because Wells Fargo is required to document property inspections on a Form 1013, and is further required to keep the Form 1013 as part of the servicing file in accordance with Freddie Mac Single-Family Seller/Servicer Guide § 65.32.

76. The broker price opinion valuation that Wells Fargo ordered on Pool's residence is related to the "servicing" of Pool's mortgage loan because Freddie Mac requires Wells Fargo to order broker price opinion valuations under appropriate circumstances in accordance with Freddie Mac Single-Family Seller/Servicer Guide § 65.25 and 65.38.

77. Pool alleges that Wells Fargo uses software entitled "Mortgage Servicing Platform" or "MSP" for short.

78.  Pool alleges that Wells Fargo can easily print off the information that she requested in her letters simply by printing off "P-390 screen shots" of property inspections, broker price opinions, and attorney fees.

79. The MSP software utilized by Wells Fargo is owned and operated by Lender Processing Services, Inc, who has granted Wells Fargo a license to use said software.

80. Pool also alleges that C.R.S. 38-40-103 does not allow a servicer to escape providing a borrower with information about their loan under the guise of confidentiality.

81. Pool alleges that her follow up letter to Wells Fargo in January 2011 was a "good faith" effort to resolve Wells Fargo's inadequate response to her November 2010 letter within the meaning of C.R.S. 38-40-104.

82. Wells Fargo's refusal to provide information concerning the servicing of her loan caused Pool actual damages in the form of emotional distress, costs of photocopies and postage, time spent in obtaining compliance, transportation costs, and inconvenience.

83. As a result of Wells Fargo's refusal to provide Pool with the information that she requested pertaining to her loan, Wells Fargo is liable to Pool for actual damages, for statutory damages of $1,000, and for all reasonable attorney fees and costs for the prosecution of this action.

WHEREFORE, the Plaintiff prays for a Court order:

a. Awarding her actual damages;
b. Awarding her statutory damages pursuant to the CCPA and C.R.S. 38-40-104;
c. For all reasonable attorney fees and costs;
d. For an order directing the Defendant to specifically perform the loan modification agreement;
e. For such other relief as the Court may deem just and proper.

s/ Matthew R. Osborne
Attorney for Plaintiff
2055 S. Oneida St, Ste 370
Denver, CO 80224
303-759-7018
matthew@mrosbornelaw.com

**PLEASE TAKE NOTICE THAT THE PLAINTIFF DEMANDS A JURY TRIAL IN THIS ACTION.**

**CERTIFICATE OF SERVICE**

I certify that on 5/23/2011, I filed a true and correct copy of the Plaintiff's First Amended Complaint via the U.S. District Court for the District of Colorado's CM/ECF filing system, which will automatically send a copy of the same to:

Nadia Malik, nmalik@faegre.com
Marie Williams, mwilliams@faegre.com

s/ Matthew R. Osborne